STATE OF MAINE                                    SUPERIOR COURT
KENNEBEC, ss.                                     CIVIL ACTION
                                                  DOCKET NO. AP-19-43


MARINA NAROWETZ, D.D.S,
        Petitioner,

                                                 **DECISION AND ORDER**


STATE OF MAINE BOARD OF
DENTAL PRACTICE,
        Respondent

## INTRODUCTION

Dr. Marina Narowetz, D.D.S. has appealed a Decision and Order of the Maine Board of Dental Practice (the Board) dated July 19, 2019 that imposed disciplinary sanctions upon her following an evidentiary hearing held on June 14, 2019. This appeal has been brought pursuant to 5 M.R.S. §§ 11001-11002 (Maine Administrative Procedure Act), 10 M.R.S. § 8003(5)(G) and M.R.Civ.P. 80C.

Dr. Narowetz contends that the Board's Decision must be vacated because: (1) she was deprived of due process as a result of bias on the part of the Board; (2) the Assistant Attorneys General handling her case had improper *ex parte* communications with Board staff; (3) expert testimony regarding the applicable standard of care was not presented at the hearing; (4) the Hearing Officer committed error by advising the Board that it could consider Dr. Narowetz' "dishonesty" while testifying in fashioning the proper sanction, and; (5) the Board violated due process when it took into consideration Dr. Narowetz' "dishonesty" when it imposed sanctions upon her.

For the reasons explained below, the Petition for Judicial Review is denied.

## FACTUAL AND PROCEDURAL BACKGROUND

Dr. Marina Narowetz (Dr. Narowetz) became licensed to practice dentistry in Maine in March 2011, and purchased a dental practice in Old Orchard Beach that

June. The practice was located in a condominium building, of which Dr. Narowetz owned half. King Weinstein, or his LLC, owned the other half of the condominium building. Sometime in 2014, an ownership dispute between the two of them arose, resulting in protracted, costly and active litigation.

On September 17, 2018, Dr. Narowetz provided a free initial dental consultation for a patient described in the record only as "Charlie." Dr. Narowetz recalled that Charlie was relatively quiet, and she did not hear from or communicate with him again. Shortly thereafter, (perhaps a few days after September 25, 2018) Dr. Narowetz's office received an envelope from Neal Weinstein, an attorney and King's brother. Dr. Narowetz initially claimed that she never saw the envelope at that time. Nevertheless, the envelope was returned to Attorney Weinstein's office unopened. On October 10, 2018, Attorney Weinstein hand-delivered the same envelope to Dr. Narowetz's office. Dr. Narowetz wrote "Refused" on the envelope, and gave it to a member of her staff with instructions to give it to the mail carrier and return it to the sender. Dr. Narowetz testified that she assumed the correspondence from Attorney Weinstein related to the contentious litigation between her and King Weinstein.

On October 29, 2018, Dr. Narowetz received correspondence from the Board, which forwarded a complaint Attorney Weinstein had filed with it a few days earlier. According to Dr. Narowetz, it was only then that she realized that the correspondence from Attorney Weinstein she had earlier refused, concerned a request for the dental records of patient "Charlie." Weinstein's complaint, however, stated that he mentioned that it was a request for records when he hand-delivered it to Dr. Narowetz's office. Dr. Narowetz did not try to contact either Weinstein or Charlie, claiming that she was not sure as to its veracity because it was unsigned, and further claiming that it would have been inappropriate to contact Charlie because he was represented by counsel. Eventually, Dr. Narowetz provided Charlie's records

to the Board. Shortly thereafter, the Board's attorneys released the records to Attorney Weinstein. On January 3, 2019, Dr. Narowetz received a signed release from Charlie authorizing her to release the dental records, which she did the following day.

In response to the Board's letter to her dated October 29, 2018, Dr. Narowetz wrote a lengthy response dated November 27, 2018, in which she denied having any knowledge of Attorney Weinstein's letter until he hand-delivered it to her office on October 10, 2018. Dr. Narowetz accused Attorney Weinstein of rude and intimidating behavior towards the members of her staff. She also claimed that she continued to be unsure what the letter from Attorney Weinstein was about or what it involved. She accused Attorney Weinstein of acting with malice, apparently because of her acrimonious relationship with King Weinstein. At around the same time as she responded to the Board's letter, Dr. Narowetz also filed written complaints against Attorney Weinstein with the Board of Bar Overseers of both Maine and Massachusetts.

At its meeting of January 11, 2019, the Board voted to offer Dr. Narowetz a consent decree in order to resolve the complaint. The proposed consent decree required Dr. Narowetz to admit that she had engaged in unprofessional conduct, as established by Board Rule Chapter 9, § II(K), by failing to surrender a copy of a patient's record upon appropriate request. In a letter dated February 27, 2019, Dr. Narowetz, through counsel, rejected the proposed consent decree and asked the Board to reconsider its position regarding the "Weinstein" complaint. In addition, counsel for Dr. Narowetz requested access to the Board's complete file including any communications between and among Board staff.

At its meeting held on March 15, 2019, the Board addressed the request for reconsideration. The Board voted to adhere to its previous offer. In the meantime, counsel for Dr. Narowetz submitted a Freedom of Access Act (FOAA) request for

access to all communications between the Attorney General's Office and the Board's staff. The Attorney General's Office responded to the request and supplied redacted copies of the requested materials on April 25, 2019.

After Dr. Narowetz rejected the consent decree, a Notice of Hearing dated April 12, 2019 was issued by the Executive Director of the Board, setting the date of the adjudicatory hearing for June 14, 2019. The specific ground alleged for imposing discipline was the alleged failure of Dr. Narowetz to surrender a copy of a patient's records. During April and May 2019, counsel for Dr. Narowetz communicated with Board staff and the Assistant Attorneys General handling the disciplinary matter. At some point during this time frame, the Board contracted with an independent attorney, F. Mark Terrison, Esq., to serve as the Hearing Officer for the upcoming hearing.

In a motion dated May 24, 2019, Dr. Narowetz sought dismissal of the complaint against her on the ground that the Assistant Attorneys General assigned to this matter served dual roles that allegedly biased the Board against her. In particular, Dr. Narowetz argued that the Assistant Attorneys General worked with Board staff and Dr. Davis (a recused Board member) investigating the complaint, then advised the Board of its options regarding the complaint and then assumed the role of prosecuting the complaint in front of the Board. Without identifying how this caused bias among the Board members, Dr. Narowetz insisted that she was entitled to a dismissal of the complaint because the process utilized by the Board and the Attorney General's Office created an intolerable risk of bias or unfair advantage.

The motion to dismiss was addressed by the Hearing Officer on the day of the hearing on June 14, 2019. The Hearing Officer noted that he did not have authority to dismiss the complaint against Dr. Narowetz, as only the Board could do that. Accordingly, the Hearing Officer referred the motion to the Board for decision,

which voted to deny the motion. *See Decision and Order dated July 19, 2019 at R-4. See also Hearing Transcript, R. at 506-507.*

Dr. Narowetz was the first witness to testify at the hearing. As found by the Board, "Dr. Narowetz was not fully truthful in her initial sworn testimony about when she received the request for records, and about her involvement in the preparation of witness statements, but returned to the witness chair to correct it." *R-5.* In essence, during her initial testimony Dr. Narowetz asserted that the first time she ever saw the letter from Attorney Weinstein was on October 10, 2018, after he had hand-delivered it to her office. She also insisted that she continued to believe that the correspondence from Attorney Weinstein pertained to the litigation with King Weinstein and that she was unaware that it actually related to a request for a patient's dental records. It was on October 10, 2018, she testified, that she wrote "Refused" on the envelope and instructed her staff to return it.

Moreover, in her initial testimony before the Board, Dr. Narowetz claimed that her former receptionist, Heather Strout, had been frightened by Attorney Weinstein's behavior on October 10, 2018 and did not want to write a statement about it for fear of reprisal from the attorney. Dr. Narowtez denied seeing any statement from Ms. Strout (Staff Exhibit 16) or "may have seen it briefly when it was in Heather's hand," but she added: "I had no involvement in drafting that statement." *R-7-8.*

At the conclusion of Dr. Narowetz's initial testimony, Cathryn Bissonnette was called to testify. Ms. Bissonnette has served as a paralegal in Attorney Weinstein's office for over 30 years. She described how, on September 25, 2018, she prepared and mailed a letter to Dr. Narowetz's office with a signed authorization for "Charlie's" dental records. On October 10, 2018, the unopened letter was returned to Attorney Weinstein's office with "RTS" and "Refused" handwritten on

it. As a result, she called Dr. Narowetz's office and spoke to someone there to explain that a records request had been returned and refused. Whomever she spoke to was confused as to why the letter was returned. Ms. Bissonnete said that Attorney Weinstein would drop off the letter on his way to court. A short time later, the "receptionist" in Dr. Narowetz's office called Ms. Bissonnette back to tell her not to have the letter delivered because "the person handling the matter was not available." *R-8*. Attorney Weinstein, however, was already on his way and hand-delivered it himself. The letter, however, was returned again on October 22, 2018, with a postal notation that read: "Return to Sender, Refused Unable to Forward." *Id*.

At this point in the proceeding, the Assistant Attorney General presenting the evidence on behalf of the Board staff, announced that the next witness would be Heather Strout, the former receptionist for Dr. Narowetz. Counsel for Dr. Narowetz request a short break which ended up lasting approximately 40 minutes. When the proceeding resumed, Dr. Narowetz returned to the witness chair to "correct" her earlier testimony.

Regarding that corrected testimony, the Board made the following pertinent findings:

> Her attorney then recalled Dr. Narowetz and asked her about her testimony concerning receipt of the correspondence from Attorney Weinstein, and Dr. Narowetz replied, 'We did get the letter at the end of September.' She explained that it had been a busy time for her then with an additional dental office opening and 'it was hard for me to recall.' Although she had testified that she wrote 'REFUSED' on the envelope on October 10, 2018, Dr. Narowetz stated 'I cannot say that with 100% assurance.' However, she insisted that she always thought the correspondence was related to the building she owned with King Weinstein.
>
> Under continued questioning by her attorney, Dr. Narowetz testified that when Ms. Reinhard [a member of her staff at the time] shared her prepared statement, 'it had grammatical errors that I corrected for her.' However, Dr. Narowetz insisted that she did not

change the substance of the statement, but added that she helped her type the notary paragraph at the end of it. Asked about Ms. Strout's statement, Dr. Narowetz testified that Ms. Strout had typed a statement of only three sentences, so 'I expanded on it.' However, Ms. Strout did not want to sign it. After Ms. Strout quit working for her in November 2018, Dr. Narowetz was concerned that the Board might conclude that she fired Ms. Strout because of her refusal to sign the statement. Asked if there was any other testimony she wished to correct, Dr. Narowetz testified that Ms. Strout had told her that the September 25, 2018 letter concerned records, but Dr. Narowetz assumed that the records involved were those she kept that were related to her joint ownership of the building with King Weinstein.

Under questioning by the Assistant Attorney General, Dr. Narowetz conceded 'it was a possibility' that she had written 'REFUSED' on the letter on September 25, 2018. Asked if she had offered Ms. Strout $100 to sign the written statement, Dr. Narowetz replied that she offered to compensate Ms. Strout for the time it took to prepare the statement. Dr. Narowetz conceded that Ms. Strout became upset about the statement, left the office, and never returned. Dr. Narowetz testified that she did not reveal these details in her original testimony because she was concerned about her license and was afraid the Board would conclude she fired Ms. Strout over her refusal to sign the statement.

*R-9.*

At the conclusion of the testimony of Dr. Narowetz, both sides rested. After the State presented its closing argument, Dr. Narowetz moved again to dismiss the complaint, this time on the basis that the State had failed to present expert testimony on the standard of care Dr. Narowetz was alleged to have violated. The Hearing Officer ruled that the Board could take that matter under advisement and rule on it after written arguments were submitted. *R-562-63 (Tr. at 232-237).*

When closing arguments were completed, the Hearing Officer instructed the Board on the allegations against Dr. Narowetz and the burden of proof. Thereupon, the Board engaged in deliberations, focusing first on whether the State had carried its burden of proving that Dr. Narowetz had

violated Board Rule Chapter 9, § II(K) by failing to surrender a patient's records upon an appropriate request. A motion was made and seconded that the State had met its burden of proof. *R-568 (Tr. at 257)*. At that point, a Board member asked whether it was appropriate to "find unprofessional conduct based on the deception and dishonesty?" *R-568 (Tr. at 257-58)*. The Hearing Officer immediately instructed the Board in the following terms:

> Due process requires that you make a ruling on the actual allegation that is before the Board obtained [sic] in the Notice of Hearing. So for today, it would be just that one allegation.

*R-568 (Tr. at 258)*.

The Board voted in favor of the motion.

The Hearing Officer then provided some instructions to the Board on the potential disciplinary sanctions that could be imposed on Dr. Narowetz. During the course of those deliberations, the issue of the honesty of Dr. Narowetz was again raised by a Board member. The Hearing Officer provided the following instruction:

> I would add that although there is one allegation about records violation, you may certainly take into account any dishonesty or anything that you see in the course of the evidence in fashioning a sanction for that records violation, but to find a separate violation for some kind of dishonesty would not be appropriate.

*R-569 (Tr. at 263)*.

When a Board member suggested a separate penalty for Dr. Narowetz's dishonesty, the Hearing Officer promptly interjected:

> The suspension to be imposed would be for the records violation. And so we're dealing with one penalty for a records violation, but it can be influenced by what happened during the course of the hearing.

*R-571 (Tr. at 270)*.

Moments later, the Hearing Officer repeated the same admonition: "Any suspension should be based upon the violation that you have found, but it can be

informed by what happened during the course of the hearing." *R-571 (Tr. at 270-71).*

From a review of the transcript, it is obvious to the court that the Board engaged in full and thoughtful deliberations as to the appropriate sanctions to be imposed on Dr. Narowetz. It is also obvious that her less-than-fully truthful testimony before the Board "informed" those deliberations about the appropriate sanctions. For example, one Board member remarked:

> I think this was someone who was not honest until it was obvious there was another witness about to discredit most of her testimony, unravel the entire story. That could have saved eight hours or so, seven hours, not to mention countless dollars and resources. I take dishonesty to the Board exceptionally seriously, and I think the licensee needs to be put on notice beyond a civil fine and the cost of the hearing, that if there's any whiff of dishonesty or deceit or violation of professional conduct, that the consequences will certainly be more severe next time.

*R-572 (Tr. at 275).*

Another Board member agreed:

> You know, although we're not judging, you know, the findings on the dishonesty, I think it does color it tremendously. And I think the goal of us is to keep the public safe, and dishonesty can lead to a lot of very poor outcomes. And I think it's also the goal of the Board to help anybody who does make a mistake correct their actions and do things more correctly in the future. And so probation, I think, helps with that. It sends a clear message. I'm fine with probation for five years.

*R-572 (Tr. at 276).*

The Board imposed the following:

> A REPRIMAND; completion of continuing education courses of three (3) hours in ethics, and three (3) hours in record keeping, to be pre-approved by the Board's Complaint Officer and to be completed within ninety (90) days of the date of this decision and order, and not to be applied toward the biennial continuing education requirement; a civil penalty of $ 1,500, plus the cost of hearing not to exceed $ 3,000, both to be paid within ninety (90) days of the date of this decision and order;

and a period of probation of five (5) years with the condition that the Licensee refrain from violation of the Dental Practice Act.

Following its decision and pursuant to the federal Health Care Quality Improvement Act, 42 U.S.C. § 11101-11111 and 45 C.F.R. § 60.1, 60.9, the Board made a report to the National Practitioner Data Bank (NPDB) and posted the Board's findings on its website. A comprehensive written decision of the Board's actions was prepared by the Hearing Officer and was adopted by the Board at its meeting on July 19, 2019. According to the Administrative Record, the Board took Dr. Narowetz's second motion to dismiss, based on the failure of the Attorney General's Office to introduce expert evidence on the standard of care, under advisement. The motion was denied by the Board on July 19, 2019. R. at 11.

Dr. Narowetz filed a Rule 80C appeal, and at the same time, brought three additional counts: Count II seeking a declaratory judgment that the Board had acted in violation of both constitutional and statutory provisions; Count III seeking injunctive relief to enjoin the Board from publishing its findings on its website and on the NPDB; and Count IV seeking a stay of the sanctions against her. She also moved to take additional evidence. The State moved to dismiss the "independent" counts and also opposed the motions for a stay and to take additional evidence. In an Order dated April 21, 2020, the court granted the State's motion to dismiss Counts II, III and IV; denied the motion to stay sanctions, and; denied the request to take additional evidence.

Briefing on the merits was completed on July 16, 2020. Oral argument was held via video on October 19, 2020.

## STANDARD OF REVIEW

The Law Court has frequently reaffirmed the principle that judicial review of administrative agency decisions is "deferential and limited." *Passadumkeag*

*Mountain Friends v. Bd. of Envtl. Prot.*, 2014 ME 116, ¶ 12, 102 A.3d 1181 (quoting *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128). The court is not permitted to overturn an agency's decision "unless it: violates the Constitution or statutes; exceeds the agency's authority; is procedurally unlawful; is arbitrary or capricious; constitutes an abuse of discretion; is affected by bias or error of law; or is unsupported by the evidence in the record." *Kroger v Departmental of Environmental Protection*, 2005 ME. 50, ¶ 7, 870 A.2d 566. The party seeking to vacate a state agency decision has the burden of persuasion on appeal. *Anderson v Maine Public Employees Retirement System*, 2009 ME. 134, ¶ 3, 985 A.2d 501. In particular, a party seeking to overturn an agency's decision bears the burden of showing that "no competent evidence" supports it. *Stein v. Me. Crim. Justice Academy,* 2014 ME 82, ¶ 11, 95 A.3d 612.

This court must examine "the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did." *Friends of Lincoln Lake v Board of Environmental Protection,* 2001 ME. 18 ¶13, 989 A. 2d 1128. The court may not substitute its judgment for that of the agency on questions of fact. 5 M.R.S. § 11007(3). Determinations of the believability or credibility of the witnesses and evidence, supported by substantial evidence in the record, should not be disturbed by the court. *Cotton v Maine Employment Security Commission,* 431 A. 2d 637, 640 (Me. 1981). The issue is not whether the court would have reached the same result the agency did, but whether the "record contains competent and substantial evidence that supports the result reached" by the agency. *Seider v. Board of Examiners of Psychologists,* 2000 ME 206, ¶ 8, 762 A.2d 551 *quoting CWCO, Inc. v. Superintendent of Insurance,* 1997 ME 226, ¶ 6, 703 A. 2d 1258, 1261.

## DISCUSSION

Dr. Narowetz has raised a number of claims on appeal seeking to overturn the Board's disciplinary decision. Her claims are primarily procedural in nature, and she has not suggested that the findings of the Board were unsupported by competent evidence in the record. Nevertheless, she does contend that the process followed by the Board created an intolerable risk of bias and unfairness.

### A. Commingling of Roles

In her first motion to dismiss, which was denied by the Board on June 14, 2019, and on appeal to this court, Dr. Narowetz has asserted that the Assistant Attorneys General assigned to this matter commingled their roles and served multiple functions for the Board at various stages of the proceedings against her. As a result, she claims that there was an unacceptably high risk of bias and unfair advantage, as described below:

> Here a significant risk was created by AAG Black and LaRose when they served in the multiple functions they were serving for the Board, i.e., investigators, advisors and prosecutors. The bias occurs because those investigating Petitioner were also advising the Board and making recommendations as to whether a violation of professional conduct occurred. These same AAGs then acted in the capacity as prosecutors while the same Board members who had previously determined on January 11, 2019, that Petitioner violated 32 M.R.S. § 18325(1)(E), and voted to offer her a Consent Agreement, then sat as the adjudicators of the very facts they had previously determined relating to Petitioner's conduct. This is an absurd and constitutionally unsound administrative procedure.

*Pet.'s Rule 80C Brief at 10.*

In support of these generalized accusations of bias and unfairness, Dr. Narowetz points to conduct by the AAGs in seeking information from her after the issuance of the Notice of Hearing dated April 19, 2019. She alleges:

. . . the bias is compounded by the Board's conduct since issuing the Notice of Hearing. On April 19, 2019, in an attempt to obtain more information to support the Board Counsel/AAG's case, the Board's Executive Director, who is also part of the investigatory team, sought additional information to support the Board's case against the Petitioner at the June 14, 2019 hearing. None of the information was previously requested or presented to the Board when it determined on January 11, 2019, it was going to discipline Petitioner. The Board did not vote to authorize the request, given that the investigation had been presented to them previously, the investigation was complete.

Nevertheless, to enhance its prosecutorial position, the Board's attorney/investigative team/prosecutor through Board staff sought additional information and indicated to Petitioner's counsel that if such information was not provided in a timely fashion the Board would pursue additional complaints against Petitioner. The contents of these requests both highlights the extent to which the functions of the Board's Counsel are mixed functions, and also demonstrates the fundamentally unfair determination made by the Board to prosecute this case.

*Pet.'s Rule 80C Brief at 13-14.*

The court has scrutinized the administrative record in this matter and has also examined all of the cases cited by Dr. Narowetz in support of her argument. The court finds no basis to conclude that the procedures used in this case created any risk of bias or unfairness. On the contrary, the court is satisfied that the conduct of the AAGs was proper and did not contribute to any due process violation.

The cases relied upon by Dr. Narowetz are easily distinguishable. *Berry v. Maine Public Utilities Comm.*, 394 A.2d 790, 793 (Me. 1978), involved an adjudicatory hearing in which Berry was denied the opportunity to present and develop his case when the commission declared that it had "heard enough." In addition, the Law Court noted that there was "some evidence" of *ex parte* communications between a commission member and a staff attorney "inconsistent with their respective roles as judge and advocate." No such circumstances are

present in this record. Although Dr. Narowetz has alleged that prohibited *ex parte* communications occurred here, she has cited no evidence that any such communications took place in connection with her adjudicatory proceeding. 5 M.R.S. § 9055(1). The issue of alleged *ex parte* communications will be addressed further later in this Decision and Order.

In *Zegel v. Bd. of Soc. Worker Licensure*, 2004 ME 37, 843 A.2d 18, the board presented one of its own members as an expert witness at the adjudicatory hearing. The board member had been involved in the case at an earlier stage when it was being investigated, and did not sit on the board at the hearing. Although the Law Court observed that "[a]n administrative process may be infirm if it creates an intolerable risk of bias and unfair advantage," it found that any error was harmless because the experts for each side testified consistently. 2004 ME 31, ¶ 16 *citing Gashgai v. Bd. of registration in Med.*, 390 A.2d 1080, 1082, n.1 (Me. 1978).

In *Schaffer v. State Board of Veterinary Medicine*, 143 Ga. App. 68, 237 S.E.2d 510 (1977),[1] the attorney acting as the prosecutor was also providing legal advice to the board in such a way that the court was compelled to conclude that a fair hearing could not be conducted. In particular, the court described the prosecutor/legal advisor as being "uncompromising" in construing legal points "strongly" against the appellant, and he did so with a "sometime venomous attitude." 143 Ga. App. at 71. No such behavior occurred in this case. On the contrary, the Board took the appropriate step of contracting with an experienced attorney to serve as the presiding officer for the adjudicatory hearing on June 14, 2019. *See* 5 M.R.S. § 9062

*Lyness v. Commonwealth,* 529 Pa. 535, 605 A.2d 1204 (1992) was a divided decision of the Pennsylvania Supreme Court that appears to have adopted a *per se*

---

[1] *Overruled on other grounds in In Re Kennedy*, 266 Ga. 249, 251, n. 1, 466 S.E. 2d 1 (1996).

rule that a due process violation occurs under the state constitution if an administrative body is involved in the investigatory stage of a matter and later sits as an adjudicatory body on the same matter. The majority in *Lyness* recognized that its interpretation of the state due process clause differed from the due process requirements embodied in the federal constitution. 605 A.2d at 1210, n. 15 (referring to *Withrow v. Larkin, 412 U.S. 35 (1971)* as embracing a different view of due process under the U.S. Constitution). *See also In Re Marcone*, 359 Fed. Appx. 807, 809 (3ᵈ Cir, 2010) ("*Lyness* is not helpful as it addresses due process under the Pennsylvania Constitution"); *Day v. Borough of Carlisle*, 2006 U.S. Dist. LEXIS 46434, *32 (M.D. Pa.) (same). This court's own research suggests that no court, other than the Pennsylvania state courts, have adopted the due process standard announced in *Lyness*. The parties have not directed the court's attention to any case that has followed the *Lyness* approach.

Finally, Dr. Narowetz relies heavily upon the decision in *Moore v. Board of Dental Examiners*, Ken. Docket No. AP-07-65, 2008 WL 4106411 (4/18/2008) (Jabar, J.). In that case, a patient sought a second opinion from an oral surgeon who was, at the time, a member of the Dental Board. He recommended that the patient file a complaint against her first dentist, Dr. Moore, and the patient did so. In her complaint, the patient detailed her discussions with the board member, "informing thereby the entire Board of his recommendation." *Decision at 2*. The board member was then called as an expert witness at the hearing by the AAG presenting the case to the Dental Board sitting as an adjudicatory body.

Justice Jabar recognized that "[a] combination of investigative and adjudicatory functions in administrative proceedings generally does not violate due process absent some further showing of bias or risk of bias." *Decision at 3 citing Zegel*, 2004 ME 31, ¶ 16, n. 3 and *Withrow v. Larkin*. Nevertheless, the court pointed to dictum in *Gashgai* for the proposition that "the combination of investigator,

prosecutor and sitting *member of the adjudicatory panel*, even if ostensibly a nonparticipating member, creates an intolerably high risk of unfairness." *Id.* (emphasis in the original). The court concluded that, even though the board member

> . . . was not himself the investigator or prosecutor, his role as a sitting board member combined with his pre-complaint treatment of [the patient], his role in advising [the patient] to file a complaint, his expressed opinions of the efficacy of the complaint as seen by the Board, and his designation as an expert witness in front of the Board on which he sat, combine to create an intolerable risk of bias or unfairness.

*Decision at 4.*

The factual circumstances of this case do not resemble either *Zegel* or *Moore*, in that no member of the Board in Dr. Narowetz's case testified as an expert witness or was personally involved in precipitating the filing of the complaint in the first place.

As a general proposition, "the combination of investigative and adjudicatory functions does not, without more, constitute a due process violation." *Withrow v. Larkin*, 421 U.S. at 58. Both the United States Supreme Court and the Maine Law Court have recognized that '[i]t is also very typical for the members of administrative agencies to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law." 412 U.S. at 56. *N. Atl. Sec., LLC v. Office of Sec.*, 2014 ME 67, ¶ 42, 92 A.3d 335 (no due process violation where Securities Administrator issued Notice of Intent to Revoke/Suspend and also adjudicated case).

Notwithstanding this general rule, however, there may be "special facts and circumstances" in a case that create an "intolerably high" risk of unfairness. Accordingly, it is necessary to look at the specific facts of a case in order to determine whether the likelihood of bias or unfairness is unacceptably high.

Looking at the facts of this case, the court is satisfied that Dr. Narowetz has failed to show any impropriety on the part of the AAGs or on the part of the Board or its staff. The allegation that the AAGs, who advised the Board and the staff during the investigative stage of the proceedings involving Dr. Narowetz, violated her due process rights by later prosecuting the charge against her at the adjudicatory hearing, is without merit. "It is neither unlawful nor uncommon for the attorney general to both give advice to various administrative agencies, and thereafter prosecute actions brought by the agency." *Collison v. Iowa Bd. of Med.*, 2014 Iowa App. LEXIS 64, * 19, 843 N.W.2d 476.

As an initial matter, it must be observed that the AAGs assigned to this matter had no authority or discretion over the Board's decision-making process. *Id.* In other words, at no point did any member of the Attorney General's Office act as an adjudicator. Stated simply: the AAGs did what they were assigned to do, namely, provide legal advice to the Board and the Board's staff during the investigatory stage, and then prosecuted the disciplinary action before the Board, as authorized by the Board. In doing so, there was no due process violation.

But Dr. Narowetz also claims that the Attorney General's Office and the Board engaged in an unfair procedure by requesting that she provide certain information to the Board staff subsequent to the issuance of the Notice of Hearing. Dr. Narowetz seems to imply that such a request for information from her, while the Notice of Hearing was pending, was improper because it was designed to "enhance" the "prosecutorial position" of the attorney general's office and the Board's staff. *Pet.'s Rule 80C Brief at 14.*

The court finds that there was nothing inappropriate or unlawful about that request for information. Indeed, such a request is explicitly authorized by state law. *See* 32 M.R.S. § 18325(1)(M) (it is a ground for suspension, revocation, modification or refusal to issue or renew a license for a licensee to fail to produce

requested documents in the licensee's possession or control "relevant to a pending complaint, proceeding or matter under investigation by the Board.").

Finally, the court would note that Dr. Narowetz appears to misapprehend the administrative process, particularly as it relates to the investigatory stage of potential disciplinary proceedings. For example, Dr. Narowetz has consistently referred to the Board's meeting on January 11, 2019 as when it "determined . . . it was going to discipline" her or that she "violated" state law. *Pet.'s Rule 80C Brief at 13-14.* In fact, the Board did no such thing on January 11, 2019. As explained in the letter to Dr. Narowetz of January 28, 2019:

> At its January 11, 2019 meeting, the Board of Dental Practice conducted an initial review of the documents collected and exchanged for the purpose of determining whether allegations contained in the above-referenced complaint filed against your license warrant disciplinary action. Following its review and discussion of the information in the complaint case, the Board voted to offer you the enclosed consent agreement in order to resolve the complaint.

*R-110.*

As a matter of fact, the Board did not "determine" at its January 11, 2019 meeting that Dr. Narowetz should be disciplined. Rather, it conducted an initial review of the complaint filed by Attorney Weinstein, and related documents, and sought to resolve the complaint by proffering Dr. Narowetz a consent agreement, which she was free to reject. As pointed out by the Supreme Court:

> The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation.

*Withrow v. Larkin*, 421 U.S. at 58.

This is not a case where a person or agency has assumed the roles of both prosecutor and adjudicator. Such a commingling of roles presents "[a] more serious

problem," because "[b]y definition, an advocate is a partisan for a particular client or point of view. The role is inconsistent with true objectivity, a constitutionally necessary characteristic of an adjudicator." *Botsko v. Davenport Civ. Rights Comm'n*, 774 N.W.2d 841, 849-50 (Iowa, 2009) *quoting Howitt v. Superior Court*, 3 Cal. Rptr. 2d 196, 202 (Cal. App., 1992). *See also* Asimow, *When the Curtain Falls: Separation of Functions in the Federal Administrative Agencies*, 81 Colum. L. Rev. 759, 773 (1981).

In advancing her claim that the AAGs and the Board violated her due process rights by assuming multiple and overlapping roles, Dr. Narowetz has "a much more difficult burden of persuasion to carry," since she "must overcome a presumption of honesty and integrity in those serving as adjudicators . . . ." *Withrow v. Larkin*, 421 U.S. at 47. *See also Beal v. Town of Stockton Springs,* 2017 ME 6, ¶ 19, 153 A.3d 768. Based on its review of the entire administrative record in this case, the court concludes that Dr. Narowetz has failed to carry her burden of persuasion of showing an intolerably high risk of bias or unfairness by the procedures employed by the Board. On the contrary, the court is satisfied that any risk of bias or unfairness was minimal at best.[2]

### B. Alleged *Ex Parte* Communications

Dr. Narowetz contends that the provisions of 5 M.R.S. § 9055, dealing with prohibited *ex parte* communications, were violated when the Executive Director of

---

[2] During oral argument, counsel for Dr. Narowetz raised, first the first time, a suggestion that Dr. Davis, who had recused himself and served as the Complaint Officer, had voted to approve the Board's Decision and Order of July 19, 2019. The court's review of the Administrative Record does not support that suggestion. The Decision and Order is clear that 8 members of the Board participated in the adjudicatory hearing on June 14, 2019, and Dr. Davis did not participate in that hearing as a Board member. R. at 2. Only 7 members of the Board were available for the public meeting on July 19, 2019, because Board member Dr. Todd Ray, who did participate in the adjudicatory hearing on June 14, was not present. R. at 11. The court understands that there are 9 members of the Board. Thus, there is no basis in the record to support the assertion that Dr. Davis participated in the adoption of the final Decision and Order on July 19, 2019.

the Board wrote to her counsel requesting that certain information be provided to the Board. R. at 127-28. Dr Narowetz seems to be suggesting that this action, presumably at the request of the Assistant Attorney General prosecuting the case, and after the Notice of Violation had been issued by the Board, transgressed the language of section 9055, which provides in part:

> In any adjudicatory hearing, no agency members authorized to take final action or presiding officers designated by the agency to make findings of fact and conclusions of law may communicate directly or indirectly in connection with any issue of fact, law or procedure, with a party or other persons legally interested in the outcome of the proceeding, except upon notice and opportunity for all parties to participate.

It is unclear to the court how the Executive Director's request for information and documents constitutes a prohibited *ex parte* communication within the meaning of 5 M.R.S. § 9055(1). As noted earlier, the request for such information is expressly authorized by 32 M.R.S. § 18325(1)(M). More fundamentally, the letter issued by the Executive Director involved no communication of any kind with any agency member "authorized to take final action." Indeed, Dr. Narowetz acknowledges that the Board itself did not even vote to authorize the request, so there does not appear to be any basis to conclude that any Board member had any role in it. *See Pet.'s Memo at 13.*

The court finds no support for the claim that 5 M.R.S. § 9055(1) was violated as a result of the Executive Director's written request for information/documents dated April 19, 2019.

## C. The Lack of Expert Testimony

Relying primarily on *Balian v. Board of Licensure in Med.,* 1999 ME 8, 722 A.2d 364, Dr. Narowetz maintains that her due process rights were violated by the failure to introduce expert testimony regarding the standard of professional conduct

she was alleged to have violated. Although *Balian* is somewhat analogous to this case, in that both cases involved the alleged failure/refusal to provide patient records upon request, in the court's view the similarities end there.

Dr. Balian was found to have engaged in "unprofessional conduct" by refusing to release a patient's medical records, but no standard of professional conduct was ever offered and introduced into evidence before the board. Rather, the board in *Balian* referred to the "American Medical Association Code of Ethics, basic principles of medical ethics and the common law," as requiring Dr. Balian to release the records. The board in *Balian* never disclosed the actual ethical standard by which the doctor's conduct was to be measured. For that reason, the Law Court found a due process violation and vacated the board's disciplinary decision. The Court pointed out, however, that the applicable standard may be established in a variety of ways, including through expert evidence or "the simple admission into evidence of the applicable AMA provisions." 1999 ME 8, ¶ 15.

In *Seider v. Board of Exam'rs of Psychologists*, 2000 ME 118, ¶& 22-23, 754 A.2d 986, the Law Court clarified that while expert testimony is ordinarily needed to establish the standard of care for the "treatment" of a patient, it is not necessary when the applicable provisions of the ethics code have been made known and are admitted into evidence.

In this case, the Notice of Violation issued by the Board informed Dr. Narowetz that she was alleged to have engaged in unprofessional conduct by violating a specific Board rule, namely, Chapter 9, §II (K) "by failing to surrender a copy of a patient's record upon appropriate request by the patient or the patient's agent within five business days of the request and within 21 calendars of the

request."[3]  R. at 13.  The Notice also contained a detailed recitation of the alleged facts.  The Rule in question was admitted into evidence at Dr. Narowetz's disciplinary hearing as Exhibit 15 and sets forth the professional obligation of a dentist to timely surrender a copy of a patient's records.  R. at 54-55.  It states that "unprofessional conduct" includes:

> The failure of a dentist to surrender a copy of a patient's records upon appropriate request by the patient or the patient's agent and payment of a reasonable duplication cost.  This rule does not require a dentist to surrender original patient records.  The records should be released within five business days of receipt of the request and shall be released within 21 calendar days of receipt of the request.  Dentists shall maintain patient treatment records for a minimum of seven (7) years after the date on which the last dental services were provided to the patient.

In the court's view, this standard defining "unprofessional conduct" complies with the Law Court's directives in *Balian* and *Seider*, and meets the due process requirements of *Mathews v. Eldridge*, 424 U.S. 319 (1976).  As in *Seider*, requiring expert testimony in this case would have needlessly prolonged the adjudicatory hearing.

Dr. Narowetz also seems to assert that she committed no violation of the rule because she provided the patient records in January, 2019.  This argument, however, misses the point.  There was competent evidence in the record for the Board to conclude that Dr. Narowetz was told by her receptionist that the correspondence from Attorney Weinstein concerned a patient's records and she nevertheless refused to open the envelope, but directed her staff to return it unopened.  That was the basis

---

[3] The rule is based on 32 M.R.S. § 18325(E): "A licensee is considered to have engaged in unprofessional conduct if the licensee violates a standard of professional behavior that has been established in the practice for which the licensee is licensed or authorized by the board."  By adopting rules, the Board has defined the standards of professional behavior which a licensee is expected to meet.

of the Board's Notice of Violation and its ultimate finding that Dr. Narowetz had violated the rule pertaining to the surrender of patient records. The court rejects the argument that Dr. Narowetz "was left to defend herself against a rule that did not exist, and for which she was not given notice of the charge." *Pet.'s Brief at 18*. On the contrary, Dr. Narowetz was given clear notice of the specific rule and the factual allegations that formed the basis for the Notice of Violation. It is, therefore, unnecessary for the court to address whether Dr. Narowetz "admitted" the violation as alleged in the Board's Brief. *See Resp.'s Brief at 25*.

## D. The Hearing Officer's Instructions to the Board

Dr. Narowetz next contends that the Hearing Officer abused his discretion when he instructed the Board, after it had found a violation by Dr. Narowetz, that it could "take into account" any dishonesty by her in fashioning an appropriate sanction. As reflected in the Administrative Record, the Hearing Officer repeatedly emphasized that the Board could not find a separate violation for unprofessional conduct based on Dr. Narowetz's lack of honesty at the hearing, but it could consider her testimony to inform or influence the Board's decision on sanctions.

In her brief to this court, Dr. Narowetz argued that the Hearing Officer abused his discretion with the result that her due process rights were violated because she did not receive notice of new charges of "dishonesty" and "misrepresentations." *Pet.'s Brief at 24*. At oral argument, however, counsel for Dr. Narowetz argued that the Hearing Officer lacked any authority at all to provide "legal" instructions to the Board, and maintained that all the Hearing Officer was authorized to do was to preside over the hearing, rule on the admissibility of evidence and regulate the course of the proceedings. 5 M.R.S. § 9062(3). Any instructions to the Board of a legal nature, according to Dr. Narowetz, would have to be provided by a separate legal advisor, either from the Attorney General's Office or as authorized outside counsel for the Board. 5 M.R.S. § 191(3)(B).

For its part, counsel for the Board on appeal, informed the court at oral argument that the Hearing Officer was authorized and approved by the Attorney General's Office in accordance with 5 M.R.S. § 191(3)(B) and subject to a contract that delineated the Hearing Officer's duties and powers, including providing legal counsel to the Board during the course of the adjudicatory hearing.

The court will not consider Dr. Narowetz's argument that the Hearing Officer was lacking in authority to provide legal guidance to the Board during the sanctions phase of its deliberations. "[A]n issue not briefed on appeal is deemed waived." *Halliday v. Henry*, 2015 ME 61, ¶ 10 n.4, 116 A.3d 1270. *See also In re Children of Christine A.*, 2019 ME 57, ¶ 9 n.4, 207 A.3d 186.

The court rejects the argument that the Hearing Officer "unilaterally" amended and added charges against her. *Pet.'s Brief at 24.* On the contrary, the Hearing Officer quite properly advised the Board that it could not find a separate violation for unprofessional conduct based on the lack of truthfulness on the part of Dr. Narowetz, but he also observed that her lack of candor (if the Board found such to be the case) was relevant on the issue of sanctions for the underlying violation of falling or refusing to surrender a patient's records. In the court's view, the Hearing Officer acted properly in so advising the Board and did not abuse his discretion.

## D. The Board's Sanctions

Finally, Dr. Narowetz has argued that she was denied due process when the Board took into consideration her alleged dishonesty during her testimony before the Board and in her response to the complaint against her. The Board has significant discretion in imposing an appropriate sanction upon Dr. Narowetz for the violation she was found to have committed. *Stein v. Me. Crim. Justice Academy*, 2014 ME 82, ¶ 23, 95 A.3d 162. A particularly aggravating factor in this case was the evidence before the Board that Dr. Narowetz: (1) was aware, despite her denials, at least as early as October 10, 2018, that Attorney Weinstein's correspondence pertained to a

patient's records; (2) embarked on a false and misleading course of conduct to conceal and/or alter evidence relating to her knowledge, and; (3) gave misleading and untruthful testimony under oath before the Board.

The court concludes that the Board acted well within its discretion in imposing the sanctions it did and in taking into consideration, as a significant aggravating factor, the dishonest and untruthful conduct and testimony of Dr. Narowetz. History has taught that while the initial transgression may seem relatively minor, it is the attempt to deceive and cover-up that greatly magnifies the violation.

## CONCLUSION

The entry is:

The Petition for Judicial Review is DENIED and the Decision of the Maine Board of Dental Practice is AFFIRMED.

The clerk is directed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Date: November 12, 2020

William R. Stokes
Justice, Superior Court

Entered on the docket 11 / 12 / 2020

STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP -19-43

MARINA NAROWETZ, D.D.S,
        Petitioner,

**ORDER ON PENDING MOTIONS**

STATE OF MAINE BOARD OF
DENTAL PRACTICE,
        Respondent

## INTRODUCTION

Before the court are the following matters: (1) Motion to Specify Future Course of Proceedings, (2) Motion to Stay Sanctions, and; (3) Motion to Take Additional evidence, filed by Petitioner Marina Narowetz. Also, before the court is a Motion to Dismiss Petitioner's Independent Claims filed by the Respondent Board of Dental Practice.

## BACKGROUND

Dr. Marina Narowetz (Dr. Narowetz) became licensed to practice dentistry in Maine in March 2011, and purchased a dental practice in Old Orchard Beach that June. The practice was located in a condominium building, of which Dr. Narowetz owned half. King Weinstein, or his LLC, owned the other half of the condominium building. Sometime in 2014, an ownership dispute between the two of them arose, resulting in protracted, costly and active litigation.

On September 17, 2018, Dr. Narowetz provided a free initial dental consultation for a patient described in the record only as "Charlie." Dr. Narowetz recalled that Charlie was relatively quiet, and she did not hear from or communicate with him again. Shortly thereafter, Dr. Narowetz received an envelope from Neil Weinstein, an attorney and King's brother. Assuming that the envelope related to the contentious litigation between her and King, Narowetz refused to open the letter,

and instructed her staff to refuse any mail from the Weinsteins. As a result, when Neil hand-delivered the same mail (in what the Board described as a tense situation, with Neil raising his voice), Dr. Narowetz wrote "Refused" on the envelope, and gave it to a member of her staff with instructions to give it to the mail carrier and return it to the sender.

On October 29, 2018, Dr. Narowetz received correspondence from the Board of Dental Practice ("the Board"), forwarding a complaint Neil Weinstein had filed with the Board a few days earlier. It was only then that Dr. Narowetz realized that the correspondence from Attorney Weinstein she had earlier refused, concerned a request for dental records regarding her patient Charlie. Weinstein's complaint, however, stated that he mentioned that it was a request for records when he hand-delivered it to Dr. Narowetz. Dr. Narowetz did not try to contact either Weinstein or Charlie, claiming that she was not sure as to its veracity because it was unsigned, and further claiming it would have been inappropriate to contact Charlie because he was represented by counsel. Eventually, Dr. Narowetz provided Charlie's records to the Board. Shortly thereafter, the Board's attorneys released the records to Attorney Weinstein. On January 3, 2019, Dr. Narowetz received a signed release from Charlie authorizing her to release the dental records, which she did the following day.

The Board, following up on its complaint, voted to bring disciplinary charges against Dr. Narowetz on January 11, 2019, for her failure to surrender records to her patient in violation of Board Rules Chapter 9, § II(K), in violation of 32 M.R.S. § 18325(1)(E). The Board also voted a that time to offer Dr. Narowetz a consent agreement to resolve the charges. Pursuant to 5 M.R.S. § 10003, Dr. Narowetz requested a hearing to have the merits of the complaint decided by the Board. Both before and during the hearing, Dr. Narowetz filed motions to dismiss, arguing, among other things, that her due process rights were being violated, and that there

was bias on the part of two of the Board's investigatory attorneys. Both motions were denied, and after the hearing was held on June 14, 2019, the Board found by a preponderance of the evidence that Dr. Narowetz had engaged in unprofessional conduct as established by Board Rules Chapter 9, § II(K), in violation of 32 M.R.S. § 18325(1)(E). After the Board's finding that Dr. Narowetz had committed a violation of its rules, Hearing Officer advised the Board that it could take into consideration Dr. Narowetz's "dishonesty" and "misrepresentations" in fashioning an appropriate sanction. The Board imposed the following:

> A REPRIMAND; completion of continuing education courses of three (3) hours in ethics, and three (3) hours in record keeping, to be pre-approved by the Board's Complaint Officer and to be completed within ninety (90) days of the date of this decision and order, and not to be applied toward the biennial continuing education requirement; a civil penalty of $ 1,500, plus the cost of hearing not to exceed $ 3,000, both to be paid within ninety (90) days of the date of this decision and order; and a period of probation of five (5) years with the condition that the Licensee refrain from violation of the Dental Practice Act.

Following its decision and pursuant to the federal Health Care Quality Improvement Act, 42 U.S.C. § 11101-11111 and 45 C.F.R. § 60.1, 60.9, the Board made a report to the National Practitioner Data Bank (NPDB) and posted the Board's findings on its website. Dr. Narowetz filed a Rule 80C appeal, and at the same time, brought three additional counts: Count II seeking a declaratory judgment that the Board had acted in violation of both constitutional and statutory provisions; Count III seeking injunctive relief to enjoin the Board from publishing its findings on its website and on the NPDB; and Count IV seeking a stay of the sanctions against her.

The pending motions were originally scheduled for oral argument on February 3, 2020. That did not occur, however, because the justice assigned to this matter recused herself and the undersigned justice assumed responsibility for this case. In

light of the outbreak of the coronavirus, and in accordance with the "Revised Emergency Order" of the Supreme Judicial Court and M.R.Civ.P. 7(b)(C)(7), the pending motions will be decided without oral argument.

## STANDARD OF REVIEW

When reviewing a motion to dismiss under Rule 12(b)(6), courts "consider the facts in the complaint as if they were admitted." *Bonney v. Stephens Mem. Hosp.*, 2011 ME 46, ¶ 16, 17 A.3d 123. The Court views the complaint "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* "A dismissal should only occur when it appears 'beyond doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim.'" *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994) (internal quotations omitted). The general rule is that only facts alleged in the plaintiff's complaint may be considered by the Court during a motion to dismiss, and that if the Court does consider materials outside the pleadings, the motion is treated as one for summary judgment. *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶ 8, 843 A.2d 43. The *Moody* Court, however, recognized three exceptions to this rule, holding that a court may consider official public documents, documents that are central to the plaintiff's claim, and documents referred to in the complaint, without converting the motion to dismiss into a motion for summary judgment, when the authenticity of such documents is not challenged. *Id.* ¶¶ 9 – 11. In considering the Board's motion to dismiss, the court may review the Board's decision and the documents related to the hearing, including Dr. Narowetz' motions to dismiss filed at the agency level.

## DISCUSSION

The court will first address the Board's motion to dismiss and will then consider Dr. Narowetz's motions.

<u>The Board's Motion to Dismiss</u>

The Board argues that, even though the complaint characterizes the additional claims as an "independent action," Counts II, III, and IV of Dr. Narowetz's complaint are, in fact, duplicative of the Rule 80C appeal and must be dismissed. The Law Court has long recognized the principle that "when a legislative body has made provision, by the terms of a statute or an ordinance, for a direct means by which the decision of an administrative body can be reviewed in a manner to afford adequate remedy, such direct avenue is intended to be exclusive." *Fisher v. Dame*, 433 A.2d 366, 372 (Me. 1981). "Resort to the courts by alternative routes will not be tolerated, subject only to an exception for those circumstances in which the course of 'direct appeal' review by a court is inadequate and court action restricting a party to it will cause that party irreparable injury." *Id.* The Law Court has commonly applied this principle in the realm of 80B and 80C appeals. *See, e.g., Antler's Inn & Restaurant, LLC v. Dep't of Pub. Safety*, 2012 ME 143, ¶ 14, 60 A.3d 1248 (affirming dismissal of plaintiff's § 1983 claims because they could be adequately reviewed in a 80C appeal); *Gorham v. Androscoggin Cnty.*, 2011 ME 63, ¶ 22, 21 A.3d 115 ("With respect to independent claims that are not subject to Rule 80B, we have held that when direct review is available pursuant to Rule 80B, it provides the exclusive process for judicial review unless it is inadequate."); *see also Kane v. Comm'r of the Dep't of Health & Human Servs.*, 2008 ME 185, ¶¶ 30-32, 960 A.2d 1196 (concluding that dismissal of § 1983 claim was not an abuse of discretion where claims of exclusion of evidence, failure to conduct meaningful review, and application of improper standard were duplicative of a Rule 80C appeal).

The Board is correct that all three counts are duplicative of the Rule 80C appeal process and should be dismissed. Counts II and IV both request duplicative relief available to Dr. Narowetz in the Rule 80C appeal process, with Count IV being particularly obvious, since it asks for a stay of the sanctions the Board levied. As

the Board points out and as conceded by Dr. Narowetz, a request for a stay is not actually a cause of action at all, but is, instead, sought by way of a motion. That Dr. Narowetz also separately brings such a motion lends further support to the Board's position. With respect to Count III, the Board maintains that it must be dismissed because the federal law that governs sending information to the NPDB, 42 U.S.C. § 11101-11111 and 45 C.F.R. § 60.1, 60.9, is controlling and preemptive. The court agrees. Because Counts II, III and IV of Dr. Narowetz's complaint ask for relief that is already available to her in her Rule 80C appeal, they are not truly "independent" claims, and must be dismissed.

In light of the court's ruling on the Board's motion to dismiss, Dr. Narowetz's Motion to Specify Future Course of Proceedings is moot.

### Dr. Narowetz's Motion to Stay Sanctions

The Maine Administrative Procedure Act sets outs the procedure by which a petitioner appealing an agency's final decision may seek a stay. Title 5 M.R.S. § 11004 provides in relevant part:

> Application for a stay of an agency decision shall ordinarily be made first to the agency, which may issue a stay upon a showing of irreparable injury to the petitioner, a strong likelihood of success on the merits, and no substantial harm to adverse parties or the general public. A motion for such relief may be made to the Superior Court, but the motion shall show that application to the agency for the relief sought is not practicable, or that application has been made to the agency and denied, with the reasons given by it for denial, or that the action of the agency did not afford the relief which the petitioner had requested. In addition, the motion shall show the reasons for the relief requested and the facts relied upon, which facts, if subject to dispute, shall be supported by affidavits. Reasonable notice of the motion shall be given to all parties to the agency proceeding.

In order to prevail on her motion, Dr. Narowetz must establish the three elements noted above: irreparable injury, strong likelihood of success on the merits,

and no substantial harm to adverse parties or to the general public. *See Bangor Historic Track, Inc. v. Dep't of Agriculture*, 2003 ME 140, ¶ 10, 837 A.2d 129 (quoting M.R. Civ. P. 65(a)) ("A temporary restraining order may be granted only if it 'clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant.'"). Indeed, "[t]he writ of injunction is declared to be an extraordinary remedy only to be granted with utmost caution when justice urgently demands it and the remedies at law fail to meet the requirements of the case." *Lisbon School Committee v. Lisbon Educ. Ass'n*, 438 A.2d 239, 246 (Me. 1981) (internal quotations omitted).

Dr. Narowetz claims that she will suffer irreparable injury as a result of two sanctions in particular; the imposition of the monetary payment and the probation. Irreparable injury is defined as an "injury for which there is no adequate remedy at law." *Id.* (quoting *Bar Harbor Banking & Trust Co. v. Alexander*, 411 A.2d 74, 79 (Me. 1980)); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("Generally, the moving party satisfies the burden by proving inadequacy of legal remedies.") (internal citations omitted). The Board contends that Dr. Narowetz has not identified any irreparable harm as a result of the monetary penalty. The Board also argues that her assertion that the probation is being used as a mechanism to suspend or revoke her license for conduct for which she was already penalized, is unsupported by evidence.

Although the monetary penalties themselves clearly do not rise to the level of irreparable injury, *see Canadian Nat'l Ry.*, 786 F. Supp. 2d at 432 ("economic harm in an of itself is not sufficient to constitute irreparable injury.") (internal citations omitted), the probation, especially since it is for a rather lengthy period of five years, makes this a closer argument, *see id.* (citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996) ("the moving party need not go so far as to 'demonstrate that the denial of injunctive relief will be fatal to its business.'")).

Ultimately, however, this still falls short of being an "irreparable injury," since the probation does not prevent Dr. Narowetz from seeing patients or continuing her dental practice. Had the Board truly suspended or revoked her license (as she claims they are attempting to do) or in some other way greatly limited her business, Dr. Narowetz may have been able to prove irreparable injury. That is not the case here, however, and since it is only a probationary period her claim falls short of establishing that her legal remedies are insufficient.

Furthermore, Dr. Narowetz faces an additional up-hill battle in proving a strong likelihood of success on the merits. As the Board points out, in order to prevail, Dr. Narowetz needs to establish that the Board's choice of penalty was an abuse of discretion. *Dyer v. Superintendent of Ins.*, 2013 ME 61, ¶ 19, 69 A.3d 416. Given that the sanctions the Board imposed are squarely within the permissible parameters delineated in 10 M.R.S. § 8005(A-1), Dr. Narowetz would likely have difficulty prevailing, especially given the exacting standard of review that comes with a Rule 80C appeal. *See Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567 ("It is not sufficient to demonstrate that, on the facts of the case, the decisionmaker could have made choices more acceptable to the appellant or even to a reviewing court."). As a result, Dr. Narowetz has failed to meet her burden of establishing the three elements necessary to grant her motion to stay the Board's sanctions.

<u>Dr. Narowetz's Motion to Take Additional Evidence</u>

Dr. Narowetz's Motion to Take Additional Evidence asserts that many of the Board members were biased against her, and were unable to impartially decide the facts and merits of her case. She claims that one Board member was a prior or concurrent client of Dr. Narowetz's attorney at the time of the hearing, that another was a direct competitor, that another believed he had previously received a threatening letter from Dr. Narowetz, and that a fourth member disclosed during the

hearing that she had a relative who was a former employee of Dr. Narowetz's. In order to more fully develop her bias argument, Dr. Narowetz seeks to depose the Board members to establish any and all biases they may have held against her.

The Maine Administrative Procedure Act (5 M.R.S. § 11006(1)(B)) sets out the requirements for taking additional evidence:

> The reviewing court may order the taking of additional evidence before the agency if it finds that additional evidence, including evidence concerning alleged unconstitutional takings of property, is necessary to deciding the petition for review; or if application is made to the reviewing court for leave to present additional evidence, and it is shown that the additional evidence is material to the issues presented in the review, *and could not have been presented or was erroneously disallowed in proceedings before the agency.* After taking the additional evidence, the agency may modify its findings and decisions, and shall file with the court, to become part of the record for review, the additional evidence and any new findings or decision.

(emphasis added). Whether or not to grant a motion to take additional evidence is within the court's discretion. *See York Hosp v. Dep't of Human Servs.*, 2005 ME 41, ¶ 22, 869 A.2d 729.

As an initial matter, Dr. Narowetz failed to raise the issue of bias of Board members before the Board itself. She did file a motions to dismiss the agency action arguing that two of the investigatory attorneys were biased against her, but her motions failed to mention any potential bias on the part of Board members. Additionally, the alleged biases on which Dr. Narowetz now relies were not hidden or undiscoverable during the hearing; quite the contrary, Dr. Narowetz knew of these issues at the time of the hearing.

Parties are required to raise objections before the agency in order to preserve them on for appeal. *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 39, 762 A.2d 551. This rule is based on "simple fairness to those who are engaged in the tasks of administration, and to litigants, … and ensures that the agency and not the

courts has the first opportunity to pass on the claims of the litigants." *Id.* (quoting *New England Whitewater Ctr. Dep't of Inland Fisheries and Wildlife*, 550 A.2d 56, 58 (Me. 1988)). As a result, "issues not raised at the administrative level are deemed unpreserved for appellate review." *Id.* (quoting *New England Whitewater Ctr.*, 550 A.2d at 58); *see also Capitol Transport, Inc. v. United States*, 612 F.2d 1312, 1325 (1st Cir. 1979) ("Contentions of bias should be raised as soon as practicable after a party has reasonable cause to believe that grounds for disqualification exist."). Because Dr. Narowetz failed to raise these issues at the hearing before the Board, she should not be allowed to raise them now.

## CONCLUSION

The entry is:

Respondent's Motion to Dismiss Independent Claims (Counts II, III and IV) is GRANTED.

Petitioner's Motion to Specify Future Course of Proceedings is MOOT.

Petitioner's Motion to Stay Sanctions is DENIED.

Petitioner's Motion to Take Additional Evidence is DENIED.

The Clerk is directed to issue a briefing schedule.


The clerk is directed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Date: April 21, 2020

William R. Stokes
Justice, Superior Court